UNITED STATES, Appellee

v.

BILLY J. WALKER, Private E-2,
U. S. Army, Appellant

6 USCMA 158, 19 CMR 284

*Major Edwin Doran* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Joseph L. Chalk* and *First Lieutenant Joseph B. Axelman.*

*First Lieutenant Howard S. Marcu* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Benjamin C. Flannagan.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial in Germany of perjury, a violation of Article 131, Uniform Code of Military Justice, 50 USC § 725. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for two years. Intermediate appellate tribunals have affirmed the findings and sentence. We granted review to determine the following issue:

Whether the evidence is sufficient to support the finding of guilty of perjury under Article 131.

During June 1954, Private Robert L. Ledford was tried by general court-martial convened at Flak Kaserne, Augsburg, Germany, for assaults and batteries against certain German Nationals during the evening of May 16, 1954. The trial counsel at those proceedings was called as a witness in this case. Without objection he testified that the accused appeared as a witness at Ledford's trial, and testified, in substance, that he, in company with another soldier named Knight, was constantly with Private Ledford from approximately 3:00 p.m. on May 16, 1954, until the three were apprehended by the military police about 11:45 p.m. on the same date; and during that time he did not see Private Ledford engage in any scuffles or fights other than with a German National named Plepp. The allegedly perjured testimony was the statement that accused did not see Private Ledford engage in any fights except with Plepp.

Because questions of fact are involved we will set out at some length the testimony offered by the Government. On or about 9:00 p.m. on May 16, 1954, Edmund Mahl, in company with a German girl, was approached by Private Ledford who made a proposition to Mahl for sexual companionship with the girl. Mahl refused, and when he noticed that Ledford had assumed a threatening position, he directed the girl to run into a nearby theater. Ledford attempted to follow the girl into the theater and Mahl scuffled with him at the entrance. The witness noticed that two American soldiers, who had been with Ledford when Mahl was accosted, had walked ahead about fifty meters and then stopped to talk.

At approximately 10:00 o'clock on the same evening, about twenty minutes' walk from the theater, a German National, Helmut Aubele, accompanied by a female friend, Berta Wank, was stopped on the street by Ledford, who expressed a desire to have sexual relations with the girl. The German refused. As he continued walking, he was struck on the head by Ledford. Aubele turned to defend himself, but, upon noticing two other American soldiers, two or three meters distant from Ledford, ran toward the front entrance of the Vincentinum Hospital to obtain the aid of several Germans standing nearby. Miss Wank took advantage of

the situation to hide behind a tree. Aubele was pursued by the three American soldiers who overtook him in front of the hospital. One of the German spectators shouted, "You pig dogs." Immediately thereafter, Ledford and one of his American companions struck Aubele several blows of sufficient force to knock him unconscious. During the assault, and before losing consciousness, Aubele covered his face in an attempt to protect himself. He, therefore, did not notice the whereabouts of the third soldier. He was positive, however, that three Americans had chased him as he ran toward the hospital entrance. The lighting conditions in front of the hospital were reasonably good.

Miss Wank testified that when she observed Ledford initially strike Aubele, the other two Americans were two or three meters away. She recalled that after being struck, Aubele ran toward the Vincentinum Hospital with the three Americans in pursuit, and "was caught up by the American and knocked to the ground."

At approximately 10:15 o'clock during the same evening, about a five minute walk from the Vincentinum Hospital, Erich Ortner, in company with Hannelore Blank, was encircled on a street corner by three American soldiers who demanded Miss Blank's company for sexual gratification. Ortner refused. Miss Blank pushed through the circle and stood two or three meters away from the soldiers. The latter threatened to knock Ortner down if he persisted in his refusal. However, the German stood fast. Thereupon, Ledford made a motion toward the other two soldiers and one walked over to Miss Blank while the other posted himself between Ortner and the girl. Immediately thereafter the German received a blow on the head which knocked him to the street. Within a few minutes after he had recovered from the effects of the blow, Ortner attempted to obtain assistance from a German in a nearby car. Miss Blank then approached the car. She was bleeding profusely from a wound on her head. During the entire altercation the American soldiers were not separated by more than two or three meters.

Miss Blank corroborated Ortner's testimony. She testified that after she had moved two or three meters from the circle, one of the American soldiers walked over and embraced her. She broke from the soldier's embrace, walked a few steps ahead and noticed Ortner lying on the street. She called, "Are you crazy?" and immediately thereafter lost consciousness. When she regained consciousness, she was lying on the street with "hit marks in the face."

Werner Plepp testified that on the same evening he was molested by Ledford in the presence of two other soldiers. He informed the military police, who took the three into custody.

To support a conviction for perjury the false testimony upon which it is based must be with respect to a material matter. The testimony of the accused at Ledford's trial was plainly material. The issue in the case was whether Ledford had committed assaults and batteries upon certain German Nationals. By testifying that he was with Ledford constantly during the critical period of time, but that he did not see Ledford engage in any fights, except the one with Plepp, the accused intended to, and did, raise an inference that, had any fights taken place, he would have seen them. He plainly implied, therefore, that, except for the Plepp incident, no assaults were committed by Ledford that night.

That the several encounters between Ledford and the German Nationals constituted fights is quite apparent. In Gitlow v. Kiely, 44 F2d 227, 232 (SD NY) (1930), a fight is defined as:

"... 'a combat or battle. A hostile encounter or engagement between opposing forces. A combat between two persons or animals ... suggesting primarily the notion of a brawl or unpremeditated encounter, or that of a pugilistic combat.'"

Webster's New International Dictionary, 2d ed., defines it as:

"... To strive or contend for victory, with armies or in single combat; to attempt to defeat, subdue,

or destroy an enemy, either by blows or weapons; to engage in physical contest. . . ."

These definitions delineate the common and widely understood meaning of the word, and it is clear that the accused understood the term in the same sense. He testified that he did not see a fight or scuffle, except that with Plepp. The record does not indicate what constituted the "molestation" of Plepp, and Plepp did not testify that he had been "assaulted"; but, significantly, when the military police arrived, he had no difficulty "mentioning" the incident to them. If the accused regarded the molestation of Plepp as a fight, he necessarily considered the vicious attacks upon Aubele, Ortner, and Miss Blank, as occurrences of that class. Since by his own admission, the accused was Ledford's constant companion, it is plain that he testified falsely to a material fact. We must determine, however, whether the evidence is sufficient to support a conviction for perjury.

The common law required that the falsity of an oath be established by the positive testimony of two witnesses, or by one witness corroborated by other evidence. Circumstantial evidence alone was insufficient, no matter how persuasive. For some time this reasoning apparently represented the weight of authority in this country, as well as in England, and it still obtains in a number of jurisdictions. Radomsky v. United States, 180 F2d 781 (CA 9th Cir) (1950); Allen v. United States, 194 Fed 664 (CA 4th Cir) (1912); Hashagen v. United States, 169 Fed 396 (CA 8th Cir) (1909); Clayton v. United States, 284 Fed 537 (CA 4th Cir) (1922); also see Wigmore, Evidence, 3d ed, §§ 2040–2043; 15 ALR 634, 639; 27 ALR 857; 42 ALR 1063. However, another view which breaks away from the old common law technicalities of pleading and proof appears in a number of recent Federal decisions. See American Communications Asso. v. Douds, 339 US 382–453, 94 L ed 925, 70 S Ct 674; Maragon v. United States, 187 F2d 79 (CA DC Cir) (1950), cert den 341 US 932, 71 S Ct 804, 95 L ed 1361; Behrle v. United States, 100 F2d

714 (CA DC Cir) (1938); Schonfeld v. United States, 277 Fed 934 (CA 2d Cir) (1921), cert den 258 US 623, 66 L ed 796, 42 S Ct 316. In Doto v. United States, the United States Court of Appeals for the District of Columbia (decided March 24, 1955) accentuated this trend, saying:

". . . The rationale of the rule is that the falsity of one person's oath cannot be established by another person's oath without more. *Documentary evidence, and even so called circumstantial evidence under some conditions, may be certain beyond doubt.*" [Emphasis supplied.] [United States v. Wood, 14 Pet (39 US) 430, 10 L ed 527; Hammer v. United States, 271 US 620, 627, 70 L ed 1118.]

The Manual's statement of the requirements of proof is consonant with the modern trend that perjury may be proved by circumstantial evidence.

". . . A witness may commit perjury by testifying that he knows a thing to be true when in fact he either knows nothing about it at all or is not sure about it, and this is so whether the thing is true or false in fact. A witness may also commit perjury in testifying falsely as to his belief, remembrance, or impression, or as to his judgment or opinion. Thus, if a witness swears that he does not remember certain matters when in fact he does, or testifies that in his opinion a certain person was drunk when in fact he entertains the contrary opinion, he commits perjury if the other elements of the offense are present." [Manual for Courts-Martial, United States, 1951, paragraph 210.]

The state of a man's mind; what he hears; what he remembers; what he sees or does not see, must of necessity be inferred from the things he says or does. Every day courts and juries pass upon the state of men's minds, having before them only evidence of the actions and words from which in the ordinary experience of mankind their mental conditions can be inferred. American Communications Asso. v. Douds, supra. So it is with proof as

162

to whether or not one saw a certain event, which proof is more than likely dependent upon whether the individual was in a position to see, upon his overt manifestations, and upon an objective view of the particular circumstances of the case. In the final analysis, of course, the accused is the only person who "knows" whether he saw the acts or not. And the truth or falsity of the testimony that he did not see the acts take place is not, in its nature, susceptible of absolute proof. State v. Woolley, 109 Vt 53, 192 Atl 1; Wigmore, Evidence, 3d ed., § 2042.

In many instances the only effective method by which belief, remembrance, impression, judgment, or ▉ opinion may be proved is by circumstantial evidence. The accused contends that the statement, "I did not see" is negative testimony, and it can not support a conviction for perjury. Coughlin v. People, 18 Ill 266; 20 Am Jur, Evidence, § 1187. This contention is too restrictive and technical. Whether testimony is negative or positive, and if negative, whether it will support a conviction for perjury, depends upon the surrounding circumstances. The determination of the probative value of negative testimony, and its relative weight, as against positive testimony, is somewhat dependent upon the ability of the witness to see in relation to the place where the alleged incident occurred. Individuals have been convicted of perjury where the testimony was limited to the fact that they did not observe the happening of an event. In State v. Woolley, supra, the defendant testified that she did not see Moody knock her husband down and choke him. She was convicted of perjury. The conviction was affirmed by the Supreme Court of Vermont.

The real question is whether the evidence shows beyond a reasonable doubt that accused did see the fights. We conclude that it does. To hold that the accused did not see Ledford engage in a fight strains credulity to the breaking point. The affairs of the evening progressed according to what clearly was a preconceived plan of action. One incident may possibly be attributed to chance; but chance cannot account for the pattern which carried through the evening. The accused and Knight were not disinterested bystanders; they went with Ledford from place to place; and they apparently intended to share in whatever success he might achieve. A careful review of the evidence makes this abundantly clear.

Aubele and Miss Wank were overtaken by the Americans and shortly thereafter, Aubele was struck in the head. Both the victim's and Miss Wank's uncontradicted testimony put all three soldiers within a limited area of two or three meters. When Aubele noticed the numerical superiority which lay with the Americans, he ran to the Vincentinum Hospital for aid. Both he and Miss Wank testified that the three Americans pursued him. Miss Wank, although hiding behind a tree, witnessed Aubele being knocked to the ground. Two of the Americans caught the German in front of the hospital, a reasonably well-lighted area, and forthwith beat him into unconsciousness. All attention would, of course, be centered upon this assault. Feeling ran high as indicated by one of the German spectators who called out, "You pig dogs." As a matter of fact, it is quite possible that the accused was the other American who assaulted Aubele, but if not, the pursuit put him in the immediate vicinity, and it is inconceivable that he did not see at least some of the activity which resulted in the German being knocked unconscious. We cannot imagine that the other American during all this time saw nothing of the contest in which he had such an important stake.

The Ortner incident is even more compelling. Ortner and Miss Blank were surrounded by three Americans shortly after Aubele had been assaulted. Ledford made his customary demand, which met with a prompt refusal. That time, according to an improved plan of attack, the parties took stations which precluded the girl's escape. After stations had been posted, Ledford immediately knocked the German to the ground. Miss Blank escaped from the embrace of the other Americans, noticed her friend on the street, and shouted, "Are you crazy?" At this point she

**163**

was knocked unconscious. The victims of these assaults testified that the other two Americans were with Ledford at all times.

The Government presented evidence showing circumstances which were connected, pertinent, and convincing, and which lead to the conclusion, beyond a reasonable doubt, that the accused swore falsely when he testified that he did not see Ledford engage in any fights.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (concurring in the result):

My brothers have accepted the view that circumstantial evidence may properly sustain a conviction for perjury—and so have voted to affirm the findings of guilty here. I am able to join in the affirmance, but on the basis of a narrower rule concerning the utility of circumstantial evidence in perjury cases. My views in the matter are aptly expressed in the opinion of the court in United States v. Otto, 54 F2d 277 (CA 2d Cir).

After referring to the conflict of precedents in this area, the Court of Appeals there commented:

"Cases which hold that circumstantial evidence is never enough to support a conviction for perjury are illustrated by Clayton v. United States (C.C.A.) 284 F. 537, and Allen v. United States (C.C.A.) 194 F. 664, 39 L.R.A. (N.S.) 385. Without doubt they are in the majority. To the extent that *whenever the subject-matter is in its nature susceptible of direct proof*, we agree with them." [Emphasis supplied.]

In discussing the cases, the Court of Appeals distinguished particularly the case of People v. Doody, 172 NY 165, 64 NE 807, where on the basis of circumstantial evidence the defendant had been convicted of having committed perjury by testifying that he did not then remember facts about which he had previously furnished specific testimony. Compare Behrle v. United States, 100

F2d 714 (CA DC Cir). The Otto court said:

". . . In that case the subject-matter dealt with was that intangible something called memory, and the proof, while called circumstantial, was as direct as the subject-matter permitted. It is obvious that all knowledge, apart from that possessed by the person himself, as to what one does remember, lies in what common experience shows he ought under given circumstances to remember. Proof of the ultimate fact can rise no higher than the limitations of human nature will allow, and when as direct proof of a fact as that fact will ever, not in the particular instance alone, but always, permit, the general rule will not preclude a conviction when the presumption of innocence has been overcome and no reasonable doubt of guilt remains. See Marvel v. State (Del. Sup.) 131 A. 317, 43 A.L.R. 1058."

It is worthy of emphasis that, in the case at bar, the subject matter of the alleged perjury was by its very nature not susceptible of direct proof. Even an ophthalmologist can do no more than infer from various circumstances the visual acuity of a patient—and certainly circumstantial evidence, and that alone, could be used to establish what Private Walker saw and what he did not see. Just as evidence of this stamp constitutes the highest order of proof logically available to show that a witness does, in fact, remember that which he asserts he has forgotten, so also circumstances —and the inferences they support— must inevitably be relied on to convict of perjury with respect to what was seen and what unseen. In short, an *opportunity* to have seen an event is all that the Government could possibly show in a case of this sort.

Indeed, in a sense circumstantial evidence *must* be relied on in virtually all instances to establish the commission of perjury. As this Court has said, a conviction of this crime must be predicated on a showing that the accused lacked an honest belief in the untrue representation. United States v. Taylor, 5 USCMA 775, 19 CMR 71. Thus,

164

his guilt will depend on his state of mind—which can only be inferred from, and inescapably must be proved by, circumstantial evidence. It would seem to follow that a too literal application of the "two witness" rule—as often phrased—would necessarily result in the provision of immunity from perjury prosecutions.

However, under my understanding of the Otto case and similar authorities, the prosecution is required to go beyond circumstantial evidence with respect to matters in their nature readily suscep-tible of proof by direct testimony. Accordingly, had the Government depended on circumstantial evidence alone to show that Walker had, in fact, enjoyed an opportunity to see, I would probably find affirmance here inconsistent with my views. However, its lawyers did not follow this course, but relied instead on direct and specific testimony to establish incontrovertibly the accused's opportunity to observe the encounters between Ledford and the various Germans involved. Therefore, the evidence is ample to sustain the court's findings.